In re the Marriage of Douglas L.
AYERS, Petitioner, Appellant,

v.

Annette C. AYERS, n/k/a Annette
C. Kotz, Respondent.

No. C1–92–997.

Supreme Court of Minnesota.

Nov. 19, 1993.

Richard D. Goff, Sonja Trom Eayrs, St. Paul, for petitioner, appellant.

Jo Marie Alexander, Laura J. Zdychoec, Brooklyn Center, for respondent.

Heard, considered, and decided by the court en banc.

WAHL, Justice.

Douglas L. Ayers appeals from a decision of the court of appeals reversing an order of the trial court which denied respondent, Annette C. Kotz (formerly Annette C. Ayers), permission to remove the parties' two chil-dren to Illinois for the purpose of establish-ing their permanent residence in that state; and transferred the primary residence of the children from Kotz to Ayers. Appellant claims that the court of appeals improperly applied the "endangerment" standard of Minn.Stat. § 518.18(d) (1992) rather than the "best-interests-of-the-child" standard re-quired by section 518.18(e) (1992). We re-verse and reinstate the order of the trial court.

The judgment and decree dissolving the parties' marriage, dated July 18, 1984, incor-porated a written stipulation entered into by the parties. The provision of the stipulation regarding custody of the parties' two chil-dren, Rose and Preston, was adopted by the court as follows:

> That custody of the minor children of the parties, namely: Rose Ellen Ayers, born December 18, 1980, and Preston Douglas Ayers, born February 17, 1982, shall be joint and in both of the Co–Petitioners herein, and each of the parties shall have reasonable visitation rights with the said children when in the custody of the other party.

The judgment set out no schedule as to the allocation of physical custody.

Shortly after the divorce, in November 1984, Annette and Douglas reconciled and lived together with their children until Janu-ary or February of 1986, when they again separated. In the fall of 1986, Annette be-gan dating Petr Kotz, an old high school friend of both Annette and Douglas. In the summer of 1988, Annette and the children moved from Bayport to Detroit Lakes, Minnesota, where Petr, now Annette's fiance, had gotten a job as an editor for Detroit Lakes Printing. Annette and Petr were married in January 1989.

On September 1, 1988, Annette brought a motion seeking sole physical custody of Rose and Preston. Douglas moved that he be granted physical custody for nine months out of the year. Annette then asked for an evidentiary hearing. These motions were de-nied without prejudice. In November 1988, when Douglas failed to return the children after a weekend visitation, Annette brought a

motion requesting that Douglas be directed to turn over to her the physical custody of the children, that she be granted interim sole physical custody, and that the court clarify and modify the custody provision in the divorce decree. Douglas asked the court to affirm the decree's award of joint custody and renewed his request to have physical custody established in him during the school year. After a hearing, the court ordered court services to provide custody and visitation mediation, and, if mediation proved unsuccessful, to undertake a custody evaluation.

On June 8, 1990, the parties entered into a second stipulation to amend the custody provision of the July 18, 1984 decree as follows:

> The parties shall have joint legal and joint physical custody of their two minor children, namely Rose Ellen Ayers, born December 18, 1980, and Preston Douglas Ayers, born February 17, 1982.
>
> The primary residence of said minor children shall be with [Annette] and [Douglas'] physical custody of said children shall be as follows: [Here a detailed schedule, omitted because of its length, gave Douglas physical custody on alternating weekends during the school year, most of the summer, every other major holiday, and half of all school vacations].

Annette was required to keep Douglas informed of the important activities in the lives of the children and of her current address and any plans to move in the future. The amendment also provided that "if [Annette] desires to move the permanent residence of the minor children to a state other than Minnesota, she must first obtain the advance written consent of [Douglas], or an Order from the Court."

In September 1991, Petr accepted a position as editor of the daily newspaper in Effingham, Illinois. On October 18, 1991, Annette filed a motion asking the court for permission to move the children to Illinois to establish their permanent residence there. She also sought to modify the custody provision of the amended decree. Douglas brought a responsive motion requesting denial of Annette's motion and asked that he be

granted primary physical custody or that an evidentiary hearing be scheduled to determine which parent should have physical custody. On November 8, 1991, the court denied Annette's motion for permission to move the children out of state and ordered an evidentiary hearing set as soon as court services submitted a custody and visitation evaluation.

The evidentiary hearing was held on February 12, 13, and 21, 1992. In chambers and outside the presence of the parties, the trial judge talked with each of the children individually. Preston told the judge, "I don't really want to move to Illinois." When asked where he would want to live if his mother moved to Illinois, Preston responded, "Probably live with Dad." Rose indicated that she had no preference about where she lived.

The court heard testimony from Donna Berner, the counselor with court services who had done the custody evaluation; Dr. Robert Barron, a licensed consulting psychologist called by Annette; and Douglas' expert, licensed psychologist Cindy Nollette. Berner testified that neither child had expressed a preference. She further testified that, although each parent had assumed the role of primary caretaker when that parent had the children, the children seemed to have spent more time with their mother.[1] Berner recommended that they be permitted to move to Illinois with Annette and spend the summers in Minnesota with Douglas.

On direct examination, Barron testified that, during his interviews with the children, Rose indicated she had no preference about where she lived and Preston, although having no preference as to which parent he lived with, wanted to stay in Minnesota. On the morning of the hearing, Preston told Barron that he had changed his mind and wished to live with his father, his primary reason being his desire to remain in Minnesota. On cross-examination, Barron indicated that Rose had stated a preference for remaining in Minnesota.

Nollette, who also had interviewed the children, testified that Rose loved both parents

---

1. In fact, under the arrangement between the parties, as approved by the court, Annette had custody of the children 245 days a year; Douglas had custody 120 days a year.

and stated no preference, but that Preston did not want to move and expressed a clear preference for living with his father.

A good deal of the testimony given at the hearing revolved around Petr Kotz' history of chemical abuse. Jack Erickson, an assessment counselor for Human Services, Inc. who evaluated Petr in November 1991, testified that Petr had used marijuana, cocaine, amphetamines, and alcohol in the past, but that the drug use had ended in 1986 and the alcohol use, though continuing until November of 1991, did not constitute abuse. Erickson saw Petr again on February 11, 1992, and concluded that he was not at that time abusing any substances. Petr testified that he had abstained from the use of all alcohol since November of 1991 and had attended Alcoholics Anonymous and Narcotics Anonymous meetings.

Petr also testified about his employment history, which included his jobs with the Chaska Herald and The Voice, then a move to Detroit Lakes where he edited several publications, and finally the editorial position with the daily paper in Effingham, Illinois. Petr testified that each of the job changes, especially the last, was a significant jump for him in terms of money and status in the trade. Petr testified on direct examination that he and Annette planned to stay in Effingham until Preston graduated from high school. On cross-examination, when asked whether he would accept a position, if offered within the next six months, with a larger newspaper in a larger town, and a higher salary, Petr answered, "No, I don't think so."[2]

Finally, there was additional testimony about the generally positive relationships the children enjoyed with their immediate and extended families, including their half-sisters, Annette and Petr's two little girls.

In its Findings of Fact and Order issued May 1, 1992, the trial court found that the provisions of Minn.Stat. § 518.18(e) rather than the provisions of § 518.18(d) were controlling and required consideration of the best interests of the children, including the statutory factors contained in Minn.Stat. § 518.17. Finding that it would be in the best interests of Rose and Preston to have their primary residence in Minnesota with their father, the court ordered joint legal and joint physical custody maintained, with the primary residence of the children with Douglas. Annette was to have physical custody of the children according to the schedule set out in the order.

On appeal, a divided panel of the court of appeals reversed, finding that the trial court had applied the wrong standard in denying Annette's request to move the children to Illinois and that, upon application of the proper standard, the move would be permitted. *Ayers v. Ayers,* 494 N.W.2d 306 (Minn. App.1993). The court of appeals then ordered that the children be returned to the physical custody of Annette. This court granted review.

I.

■ The primary issue for our determination is whether the trial court erred in applying the "best-interests-of-the-child" standard of Minn.Stat. § 518.17 rather than the "endangerment" standard of Minn.Stat. § 518.18(d) to respondent's request to move the children's residence to another state. The scope of appellate review of custody determinations is limited to whether the trial court abused its discretion by making findings unsupported by the evidence or by improperly applying the law. *Lenz v. Lenz,* 430 N.W.2d 168, 169 (Minn.1988); *Sefkow v. Sefkow,* 427 N.W.2d 203, 210 (Minn.1988). The trial court's findings must be sustained unless clearly erroneous, *id.,* but we need not defer to the trial court in reviewing questions of law. Determining the proper statutory standard to be applied presents a question of law. *Dabrowski v. Dabrowski,* 477 N.W.2d 761, 764 (Minn.App.1991).

■ Douglas argues first that the trial court did not err in applying the best inter-

---

**2.** Appellant in his brief noted that Annette and Petr are currently in the process of moving to Ohio. Respondent confirmed that Petr and his employer are now co-owners of a newspaper in Cleveland. This information was not before the trial court and therefore will not be considered on appeal.

ests standard to Annette's request for permission to move the residence of the children to Illinois because that motion sought to modify a prior joint custody order within the meaning of section 518.18(e) (1992), which provides:

> In deciding whether to modify a prior joint custody order, the court shall apply the standards set forth in paragraph (d) unless: (1) the parties agree in writing to the application of a different standard, or (2) the party seeking the modification is asking the court for permission to move the residence of the child to another state.

The trial court determined that the situation here was controlled by the provisions of section 518.18(e) and, accordingly, applied the best interests standard found in Minn.Stat. § 518.17 rather than the endangerment standard of section 518.18(d).

The court of appeals found the trial court's reliance on subsection (e) misplaced because; in its view, Annette's motion did not seek to modify a prior joint custody order but only a prior custody order to which Minn.Stat. § 518.18(d) with its endangerment standard applies. *Ayers v. Ayers,* 494 N.W.2d at 309. Section 518.18(d) (1992), in relevant part, provides:

> If the court has jurisdiction to determine child custody matters, the court shall not modify a prior custody order unless it finds, upon the basis of facts that have arisen since the prior order or that were unknown to the court at the time of the prior order, that a change has occurred in the circumstances of the child or the parties and that the modification is necessary to serve the best interests of the child. In applying these standards the court shall retain the custody arrangement established by the prior order unless:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (iii) the child's present environment endangers the child's physical or emotional health or impairs the child's emotional development and the harm likely to be caused by a change of environment is out-

weighed by the advantage of a change to the child.

\*　　\*　　\*　　\*　　\*　　\*

Although the 1990 amended decree specifically states that Annette and Douglas "shall have joint legal and joint physical custody of their two minor children," the court of appeals concluded that "the parties intended that the children would reside with [Annette] and that [Douglas'] contacts with the children would be more in the nature of visitation," *id.* at 310–11, an arrangement under which "there is a presumption that [Annette] may move the children's residence." *Id.* at 311 (citing *Auge v. Auge,* 334 N.W.2d 393, 398–400 (Minn.1983)). In *Auge* we held that a custodial parent in Minnesota is presumptively entitled to remove his or her child to another state, but specifically declined to decide the rule for cases involving joint custody. 334 N.W.2d at 396 n. 2.[3]

The court of appeals in this case reached the issue of the parties' intent by determining that their stipulation was "internally inconsistent" in that it labeled the custody arrangement one of joint legal and joint physical custody but placed the children's "primary residence" with Annette. *Ayers,* 494 N.W.2d at 310. The court looked to the statutory definitions of "residence" and "joint physical custody" in concluding that "a custody arrangement where the children's 'residence' is with one parent is statutorily incompatible with the term 'joint physical custody.'" *Id.* The definitions of these terms are found in Minn.Stat. § 518.003:

> Subdivision 1. For the purposes of this chapter, the following terms have the meanings provided in this section unless the context clearly requires otherwise.
>
> Subd. 2. "Residence" means the place where a party has established a permanent home from which the party has no present intention of moving.
>
> Subd. 3. **Custody.** Unless otherwise agreed by the parties:
>
> \*　　\*　　\*　　\*　　\*　　\*

---

**3.** In *Gordon v. Gordon,* 339 N.W.2d 269 (Minn. 1983), we extended the presumption in favor of the physical custodian's removal decision to a case where the stipulated decree awarded joint legal custody of the three minor children to both parties but granted sole physical custody to the mother.

(d) "Joint physical custody" means that the daily care and control and the residence of the child is structured between the parties.

In our view, the court of appeals mischaracterized the custody arrangement here as one "where the children's 'residence' is with one parent." 494 N.W.2d at 310. The stipulation provided that the children's "primary" residence would be with Annette. This provision, rather than being incompatible with the label "joint physical custody," is consistent with an arrangement in which the residence of the children is "structured between the parties." The stipulation clearly laid out that structure as one in which the children would reside primarily with Annette and secondarily with Douglas according to a detailed schedule.

The parents in this case agreed in their stipulation that they would share joint physical custody of their children, but structured an arrangement whereby the children spent unequal amounts of time with each parent. As the court of appeals has stated in the past, "[j]oint physical custody does not require an absolutely equal division of time * * *," *Hegerle v. Hegerle*, 355 N.W.2d 726, 731–32 (Minn.App.1984), and the legislature has not enacted that requirement.

■ Custody provisions contained in a stipulated decree must be accorded a good deal of deference, in that they represent the terms specifically agreed to by the parties and adopted by the court. Where, as here, the parties have agreed, by stipulated decree, to joint legal custody and joint physical custody of their children and to the specific terms for the implementation of that custody, and the court has accepted that denomination, the parties will be bound by it. Although this holding will require careful drafting by the parties in the first instance, it will provide more certainty in resolving future disputes.

■ Having held that we must accept the label of joint legal and joint physical custody given the arrangement by Douglas and Annette in the 1990 amended decree, we further hold that the trial court correctly applied Minn.Stat. § 518.18(e) in deciding whether to modify this prior joint custody order.

Section 518.18(e) requires the court to apply the endangerment standard in joint custody cases, unless "(1) the parties agree in writing to the application of a different standard, or (2) the party seeking the modification is asking the court for permission to move the residence of the child to another state." Annette argues that her request for permission to move the children to Illinois does not constitute a request to modify the custody order and because, as such, it does not fall under the second exception to section 518.18(e), the endangerment standard should be applied. Annette contends that she is merely seeking to "adjust Douglas' visitation" and that it is Douglas, not she, who is requesting custody modification. The adjustment Annette is seeking, however, is not insubstantial. Whereas the terms of the parties' stipulated amended decree gave Douglas physical custody of the children on alternating weekends during the school year, Annette's proposed alteration of the custody provision, while leaving intact the "joint legal and joint physical" denomination of the arrangement, allowed Douglas virtually no custody during the school year. We cannot agree that such an alteration would not constitute a modification of the prior joint custody order.

Finally, Annette argues, from a public policy standpoint, that the *Auge* presumption should be extended to joint physical custody cases where custody is not equally divided. Even if this court were to take such a step and were Annette to be given the benefit of the *Auge* presumption, her motion to move Rose and Preston to Illinois need not be granted if Douglas, as the party opposing the move, could establish "by a preponderance of the evidence that the move is not in the best interests of the [children]." *Auge*, 334 N.W.2d at 399. The trial court in this case found, after considering all of the evidence and arguments presented, that "it would be in the best interests of the children for their primary residence to remain in Minnesota with [Douglas]."

## II.

■ If the trial court did not abuse its discretion in applying the "best interests" rather than the "endangerment" standard, the question remains whether it abused that discretion by making findings unsupported by the evidence. The trial court made detailed findings with regard to the best interests factors contained in Minn.Stat. § 518.17, subd. 1(a). After examining the evidence, as we must, in the light most favorable to those findings, *see Johnson v. Smith,* 374 N.W.2d 317, 319 (Minn.App.1985) (citation omitted), we conclude that the record adequately supports the findings of the trial court that the best interests of the minor children will be served by maintaining joint legal and joint physical custody in both parties, with the primary residence of the children to remain in Minnesota with petitioner/appellant Douglas Ayers.

■ Lastly, we consider Annette Kotz' request for attorney fees and costs in this appeal. While we agree that she should be allowed some fees, her request for $2,500.00 seems excessive, especially in light of the court of appeals' award of $500.00 for her appeal to that court. We therefore award Annette Kotz attorney fees of $500.00 in connection with this appeal.

The decision of the court of appeals is reversed and the order of the trial court is reinstated.